**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GRACE SMITH, MICHAEL O. SMITH, AND J.A. SMITH (MINOR CHILD),** *Plaintiffs*, <br><br> v. <br><br> **ST. LUKE'S HOSPITAL UNIVERSITY HEALTHCARE NETWORK ANDERSON CAMPUS, et al.,** *Defendants*. | **CIVIL ACTION NO. 22-1478** |

**MEMORANDUM OF DECISION**

BAYLSON, J.                                            February 3, 2022

## I.    INTRODUCTION

This case is one of several filed by pro se Plaintiffs[1] with the Court, each against myriad different defendants but all stemming from the same alleged chain of events.  That chain of events occurred in the hours and days following the birth of Plaintiff J.A. Smith ("Baby J.A.S.") to Plaintiff Grace Smith and her husband Plaintiff Michael Smith on a late Thursday evening in April 2021 at St. Luke's Hospital in Easton, Pennsylvania.  Mr. and Mrs. Smith allege that over the course of the 72 hours following Baby J.A.S.'s birth, they were illegally barred from taking Baby J.A.S. home with them and were subject to illegal visiting restrictions, all due to a faulty drug test result and without constitutionally required due process.

Here, the three Plaintiffs bring several claims against the hospital, its legal counsel, its administrators, and its security guards.  Aside from the hospital itself, St. Luke's Hospital Anderson Campus ("St. Luke's" or "the hospital"), the individual defendants include

---

[1] Plaintiffs requested to proceed in forma pauperis, which the Court denied.  See Order Denying Motion To Proceed IFP, Grace Smith, et al. v. St. Luke's Hospital University Healthcare Network Anderson Campus, et al., No. 5:22-cv-1478-MMB (ECF 6).  Plaintiffs have chosen to proceed pro se.

mononymous security guards Freddy, Joe and Nate ("Hospital Security"), hospital legal counsel Steve Lanshe and Robert L. Wax ("Hospital Counsel"), hospital administrators Darla Frack and Dawn Hoffman ("Hospital Administrators"), and a decision-making body called the Hospital Leadership Team.  The claims include intentional infliction of emotional distress, violations of procedural due process, violations of substantive due process, violations of equal protection, and violations of the Americans with Disabilities Act.  Defendants have filed this Motion to Dismiss Plaintiffs' Third Amended Complaint, on which the Court now rules.

For the reasons stated below, the Court will grant Defendants' Motion with prejudice as to Grace and Michael Smith's federal claims, decline pendent jurisdiction as to Grace and Michael Smith's state law claims, and dismiss Baby J.A.S.'s federal and state law claims without prejudice.

## II.   FACTS AND PROCEDURAL HISTORY

### A.  Facts As Alleged

Sometime on April 8, 2021, Grace and Michael Smith arrived at St. Luke's, located in Easton Pennsylvania, Northampton County.  See Third Amended Complaint ("TAC") at 4 (ECF 45).  During intake with the hospital, a pregnant Mrs. Smith provided St. Luke's staff with her medical history, which included a prescription for Vyvanse that Mrs. Smith used to treat her ADHD.[2] Id.  Also during intake, Mrs. Smith submitted a urine sample for a drug screening which resulted in a positive result for amphetamine or methamphetamine—the test employed by the hospital does not render differentiated results between these two compounds.  Id.  In the evening of April 8, Mrs. Grace gave birth to Baby J.A.S.  Id. at 5.

---

[2] Vyvanse is a stimulant medication used to treat Attention Deficit Hyperactivity Disorder.  See "Lisdexamfetamine Dimesylate," MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/lisdexamfetamine-dimesylate-oral-route/description/drg-20070888 (last viewed 2/2/2023).

On April 9, Dr. Santiago (not a defendant in this case or the other Smith cases) determined that Baby J.A.S. was healthy without any complications. Id. Dr. Santiago noted in Baby J.A.S.'s medical record, in reference to Mrs. Smith, that the drug screening was "positive for methamphetamines." Id. However, two other doctors examined Baby J.A.S. and determined that a chest x-ray would be necessary and that Baby J.A.S. should be admitted into the neonatal intensive care unit (NICU). Id. 6-7. The Smiths told St. Luke's staff that they would like to go home with Baby J.A.S., at which point Dr. Marlino (a defendant in another Smith Case, 22-3786) informed the Smiths that hospital staff submitted a report to Children Youth Services ("CYS") based on the results of Mrs. Smith's drug test.[3] Id. at 7. When the Smiths insisted that they take Baby J.A.S. home with them, Hospital Counsel, Hospital Administrators and the Hospital Leadership team instituted a lockdown of the NICU. Id. at 7-8. Hospital Security and two Bethlehem Township police officers arrived to assist with the lockdown and were told by St. Luke's staff that Mrs. Smith had ingested methamphetamine and that Baby J.A.S. had to remain in the NICU for further treatment and until he was cleared to leave by CYS. Id. at 8. The police officers escorted the Smiths out of the building under threat of arrest. Id.

On April 10, a St. Luke's nurse informed the Smiths that Mrs. Smith could come visit Baby J.A.S. in the NICU, but that Mr. Smith would not be allowed to enter the hospital. Id. at 9. Over the next few days, Mrs. Smith was permitted to visit Baby J.A.S. and breastfeed him, but under constant round-the-clock supervision by the St. Luke's nursing staff and Hospital Security. Id. Baby J.A.S.'s NICU pod had glass walls through which the nurses could peer in while Mrs. Smith was attending to the newborn and the curtain over the doorway was kept open at all times

---

[3] Throughout the Complaint and Defendants' Motion, the parties refer to the respective counties' children and youth services agencies as "Children Youth Services," or "CYS." For continuity with the briefs, the Court will also refer to these entities (which are not named as defendants by the Smiths) as "CYS."

so that Hospital Security could supervise Mrs. Smith from outside the pod.  Id. at 10-11.  Mrs. Smith was not offered food or water and had to use the hospital water fountains and cafeteria; she was escorted by Hospital Security to the cafeteria and to the restrooms.  Id. at 11.

On the morning of Monday April 12, a CYS caseworker visited Mrs. Smith in the NICU. Id. 12.  The caseworker conducted an interview of Mrs. Smith and requested that Mrs. Smith furnish an additional urine sample, with which she complied.  Id. at 13.  The caseworker notified Mrs. Smith that he had told the hospital she was "ok to be here with the baby" back on April 10. Id.  Sometime on April 12, St. Luke's discharged Baby J.A.S.  Id.  Mrs. Smith's parents arrived at the hospital to take Mrs. Smith home, as Mr. Smith was still not allowed on the premises.  Id.

**B.  Procedural History**

The procedural history of this case is somewhat convoluted.  On April 11, 2022, Grace, Michael and J.A.S. filed a 925-page pro se complaint with the Court asserting various state and federal claims against scores of private and government defendants.  See Complaint, Grace Smith, et al. v. St. Luke's Hospital University Healthcare Network Anderson Campus, et al., No. 5:22-cv-1478-MMB, (ECF 2).  Grace Smith represents herself to be an attorney barred in Pennsylvania, while Michael Smith represents himself to have graduated from law school but is not a barred attorney.

On June 16, 2022, the Court ordered Plaintiffs to file an amended complaint "that complies with the Federal Rules of Procedure and the Local Rules of this Court" within 30 days. See Order Re Plaintiffs' Complaint, (ECF 21).  On June 22, 2022, Plaintiffs filed a 926-page amended complaint.  See First Amended Complaint, (ECF 34).  Again, the Court ordered Plaintiffs to amend their complaint, this time expressly limiting it to 50 pages.  On July 11, 2022,

Plaintiffs filed a second amended complaint consisting of a 51-page complaint and an accompanying 45-page brief.  See Second Amended Complaint, (ECF 41).

Following a Rule 16 conference held at the courthouse, on July 14, 2022 the Court struck Plaintiffs' second amended complaint for failure to comply with the Federal Rules of Civil Procedure and Local Rules of this Court and ordered Plaintiffs to file "new, separate Complaints" of 50 pages or less.  See Order, (ECF 43).  Specifically, the Court ordered Plaintiffs to file separate complaints (with separate case numbers) against groups of similar defendants, which would then all be assigned individually to the Court as related cases.  See July 14, 2022 Rule 16 Hrg. Tr. at 20-21, (ECF 48).  Plaintiffs eventually filed five separate complaints in adherence to this Order, including a Third Amended Complaint under the original case number, which is the operative complaint in this case.

On September 14, 2022, Plaintiffs filed their Third Amended Complaint.  See TAC (ECF 45).  On November 14, 2022, Defendants filed this Motion to Dismiss, seeking to dismiss all of Plaintiffs' claim for failure to state a claim upon which relief can be granted.  Def. Mot. (ECF 47).  Before Plaintiffs responded, Defendants filed a premature Reply on November 30, 2022.  After a grant of extension of time by the Court, Plaintiffs filed their Response on December 16, 2022, a brief lacking any case citations.  See Plf. Resp. (ECF 55).  Defendants then filed another Reply on December 29, 2022, in which they lodge a request that the Court strike Plaintiffs' Response for failure to comport with the Federal Rules of Civil Procedure and the Court's filing rules.  Def. Reply (ECF 58).

With the Motion now ripe, the Court will consider Plaintiffs' claims, which include:

Count 1:  Violations of Procedural Due Process,

Count 2:  Violations of Substantive Due Process,

Count 3:  Violations of Equal Protection,

Count 4:  Violations of the Americans with Disabilities Act,

Count 5 and 6:  Intentional Infliction of Emotional Distress.

### III.   JURISDICTION

The Court has subject-matter jurisdiction over Plaintiffs' constitutional and federal claims under 28 U.S.C. § 1311 (federal question jurisdiction) as they address issues of federal law. Because the Court will grant Defendants' Motion to Dismiss for the plaintiff-parents' federal claims, the Court declines pendent jurisdiction as to their state law claims.[4]

### IV.   DISCUSSION

#### A.  Defendants' Motion to Strike Plaintiffs' Response

First, the Court will address Defendants' argument from their Reply that the Court should strike Plaintiffs' Response to the Motion for failing to submit their brief on time and to treat the Motion as uncontested.  The Court will deny this Motion to Strike.

The Court acknowledges that both sides have now sought to sanction the other as a consequence of alleged failures to adhere to filing deadlines, word limits, and other rules that the Court has provided primarily to maintain efficiency.  Plaintiffs' case is a complicated one, evinced by the number hearings, court orders and filings that have occurred before a Rule 12 motion has even been ruled upon.  The Court asks that the parties continue to adhere to these rules throughout the course of this litigation.  Extensions for time, if truly needed, will be granted and objections are not appropriate.

#### B.  Rule 12(b)(6) Standard of Review

---

[4] 28 U.S.C. § 1367(c)(3) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim under susbection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."

In considering a motion to dismiss under FED.R.CIV.P. 12(b)(6), the Court "accept[s] all factual allegations as true [and] construe[s] the complaint in the light most favorable to the plaintiff."  Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotations and citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Although a court must accept as true all factual allegations contained in a complaint, this requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted.  Iqbal, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  (citing Twombly, 550 U.S. at 555); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (citing Twombly, 550 U.S. at 556 n.3) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests.")).  Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

Under the "John Doe Defendant" rules, the Court will consider for the Motion the claims brought against both the Hospital Leadership Team, which Plaintiffs describe in the pleadings as "a decision making body . . . used to consult St. Luke's Hospital," and the three mononymous Security Guard Defendants who Plaintiffs describe as "St. Luke's Hospital security guards."  See Blakeslee v. Clinton County, 336 Fed.Appx. 248, 250 (3d Cir. 2009) ("Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true

7

defendants to be identified. . . . If reasonable discovery does not unveil the proper identities,

however, the John Doe defendants must be dismissed").

**C.  Baby J.A.S.'s Claims**

For purposes of this Motion, the Court will not make a ruling as to the claims brought on

behalf of Baby J.A.S.S., who is included as a claimant for Counts 2, 3, 4 and 5.  Instead, the

Court instructs the parties to refer to this Memorandum of Decision's accompanying order on

how to proceed with Baby J.A.S.S.'s claims.  The Court's decision to proceed in this uncommon

fashion is based on an uncommon need given the facts of the case and the method by which it

has been litigated by Plaintiffs and is consistent with established precedent and the Court's

reasoning below.

The Third Circuit has held, unequivocally, that a parent who is not an attorney must be

represented by legal counsel in bringing an action on behalf of his or her minor children.  See

Osei-Afriyie by Osei-Afriyie v. Med. College of Pa., 937 F.2d 876, 878 (3d Cir. 1991)

(Hutchinson, J.).  In Osei-Afriyie, a plaintiff non-lawyer appealed a jury's defense verdict on a

series of federal and state claims he asserted on behalf of himself and his two minor daughters

against a hospital related to the hospital's alleged use of experimental treatment on the daughters.

In vacating the jury verdict as to the daughters' claims, the Third Circuit agreed with the Second

Circuit: "The choice to appear pro se is not a true choice for minors who under state law, cannot

determine their own legal actions.  There is thus no individual choice to proceed pro se for courts

to respect, and the sole policy at stake concerns the exclusion of non-licensed persons to appear

as attorneys on behalf of others."  Cheung v. Youth Orchestra Found. of Buffalo, Inc., 906 F.2d

59, 61 (2d Cir. 1990) (holding that a non-attorney parent must be represented by counsel in

bringing an action on behalf of his or her child).

However, the Third Circuit has not held whether a parent *who is* an attorney is permitted to represent their minor child in litigation in which the parent also has a claim.  The closest the Third Circuit has come to addressing this issue was Woodside v. Sch. Dist. of Philadelphia Bd. of Educ., where the court held that an attorney-parent could not collect attorney's fees for his successful representation of his minor child's claims in administrative proceedings under the IDEA.  See 248 F.3d 129 (3d Cir. 2001).  Woodside can be distinguished from the case at bar because the attorney-parent in Woodside did not have individual claims in the underlying litigation, only the child-plaintiff did.  This distinction is important, because the Woodside court's reasoning did not focus on the relationship between the parent-attorney and child-plaintiff, but on the interpretation of the fee-shifting statute within the Act, quoting the U.S. Supreme Court that "the statutory policy of furthering the successful prosecution of meritorious civil rights claims is better served by a rule that creates an incentive to retain independent counsel, rather than a rule that creates an incentive to represent one's self."  Woodside, 248 F.3d at 131 (quoting Kay v. Ehrler, 499 U.S. 431, 438 (1991) (holding similarly that a pro se plaintiff who is an attorney cannot be awarded attorney fees under the fee-shifting provision of the Civil Rights Attorney's Fees Awards Act)).  The Smiths' case calls for different focus, which is whether a parent-attorney can properly litigate the claims of their minor child that fall directly alongside the parent-attorney's own claims in the litigation.  Cf. Doe v. Bd. of Educ. of Baltimore Cty., 165 F.3d 260, 263-64 (4th Cir. 1998) ("Like attorneys appearing pro se, attorney-parents are generally incapable of exercising sufficient independent judgment on behalf of their children to ensure that 'reason, rather than emotion' will dictate the conduct of the litigation.") (quotation omitted).

Indeed, the Third Circuit later adopted the reasoning from Doe in extending Woodside to hold that parent-attorneys could not collect attorney's fees from successful litigation of their child's IDEA claims in federal court, as opposed to administrative proceedings: "[W]e reached our conclusion [in Woodside] based on our observation that 'attorney-parents are generally incapable of exercising sufficient independent judgment on behalf of their children to ensure that reason, rather than emotion will dictate the conduct of the litigation.'"  See Pardini v. Allegheny Intermediate Unit, 524 F.3d 419, 425 (3d Cir. 2008) (quoting Doe, 165 F.3d at 263).

Some courts have even acknowledged a further distinction—that specifically in an IDEA case, a parent-attorney representing their child is not acting pro se.  See Doe, 165 F.3d at 263-64 (4th Cir. 1998).  This distinction is important because without it, courts would necessarily have to interpret Woodside and Pardini to also stand for the proposition that parent-attorneys are permitted to represent their children in any litigation, since the Third Circuit's holdings fell short of banning such arrangements in those cases.

It should also be noted that both Mrs. Smith, a licensed attorney, and her husband Mr. Smith, who graduated law school but is not a licensed attorney, have entered appearances on behalf of themselves respectively.  On the docket, Baby J.A.S.S. is "represented by J.A.S.S. Smith."  This must be an error.  It is unclear which parent has entered their appearance on behalf of the minor child.  Mr. Smith addressed the Court as if he had written the earlier complaints which Mrs. Smith then reviewed.  See July 14, 2022 Rule 16 Hrg. Tr. at 15, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 48).  Mr. Smith claims to have graduated law school but has not claimed that he is a licensed attorney.  Pennsylvania does not allow non-lawyers to represent parties before the courts.  GLTM Properties, LLC v. Rizvi, No., 2014 WL 10937119, at *1 n.1

(Pa. Super. Ct. Apr. 23, 2014) (citing to <u>Osei-Afriyie</u>).   Therefore, Mr. Smith's continued pro se representation of Baby J.A.S.S. is at odds with the holding in <u>Osei-Afriyie</u>.

Looking at both the facts of the case and the manner by which it has been litigated by the Smiths as can be gleaned from their filings, as well as the Third Circuit opinions and other persuasive reasoning outlined above regarding the Court's duty to protect the rights of the minor-child plaintiff, the Court concludes that Mr. and Mrs. Smith are too conflicted to provide adequate representation for their child's claims in this case, notwithstanding the single good-standing bar license of Mrs. Smith.   The facts of the case are as emotional and intense as they come: parents separated from their newborn child due to an allegedly faulty drug test.   For their part, the Smiths allege a string of continuing psychological injuries as result of these events that would make any lawyer question whether they are capable of a detached and competent representation.   The lengthy filings of the Smiths have been rife with language that resembles emotionally charged interjection rather than cogent legal argument.   Finally, the Smiths have failed to allege in their Complaint any injury suffered by Baby J.A.S.S. himself—they only allege injuries that they themselves suffered, a theme consistent with the rhetoric of their Response Brief and that on its face would usually doom a plaintiff's claims.   <u>See</u> <u>Hedges v. Musco</u>, 204 F.3d 109, 121 (3d Cir. 2000) ("It is axiomatic that a § 1986 action, like its tort analogs, employs the principle of proximate causation.") (internal quotations omitted). Furthermore, the ABA's Model Rules provide that "[a] lawyer's own interests should not be permitted to have an adverse effect on representation of a client. . . . [I]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice."   <u>See</u> ABA MODEL RULES OF PROFESSIONAL CONDUCT, Rule 1.7 Conflict of Interest: Current Clients – Comment [10].

https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pr ofessional_conduct/rule_1_7_conflict_of_interest_current_clients/comment_on_rule_1_7/ (last visited Feb. 1, 2023). The Smiths have only demonstrated that the Court must step in to uphold its duty to the child-plaintiff in this situation.  Therefore, for the purposes of this Motion, the Court will analyze and rule solely on the claims of the parent-plaintiffs, Mr. and Mrs. Smith.

While this issue was not raised by any of the parties in this case, the issue is not therefore waived.  "The right to counsel belongs to the children, and . . . the parents cannot waive this right."  Osei-Afriyie, 937 F.2d at 883.

### D.  § 1983

To start, 42 U.S.C. § 1983 serves as a vehicle allowing a plaintiff to bring a cause of action against individual state actors for violating a right protected under the U.S. Constitution.[5]

Here, the Smiths bring three separate counts under § 1983 against several private actor Defendants, alleging violations of the Due Process Clause and the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment.  Under § 1983, plaintiffs may bring causes of action against private actors as well, where "the private-party defendant may be appropriately characterized as a 'state actor.'"  See Diamond v. Pa. State Educ. Ass'n., 972 F.3d 262, 269-70 (3d Cir. 2020).  Simply put, to establish a claim under § 1983 against a private actor, the plaintiff "must show that the defendants 1) were state actors who 2) violated [the plaintiff's] rights under the Constitution or federal law."  Benn v. Universal Health System, Inc., 371 F.3d 165, 169-70 (3d Cir. 2004) (Alito, J.) (footnote omitted).

---

[5] § 1983 states:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ."

A defendant qualifies as a "state actor" under the statute when the defendant acts "under color of any statute, ordinance, regulation custom, or usage of a state." Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005). When evaluating whether a private entity or actor has acted under the color of state law for purposes of proceeding on a § 1983 claim, "the relevant question is not whether the private actor and the state have a close relationship generally, but whether there is 'such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'" Borrell v. Bloomsburg Univ., 870 F.3d 154, 160 (3d Cir. 2017) (Hardiman, J.) (emphasis omitted). The Third Circuit has recognized multiple vantages for evaluating this "close nexus" question, although all of them converge on the same principles. First, in Mark v. Borough of Hatboro, the Third Circuit recognized that the U.S. Supreme Court "appears to utilize three discrete tests to determine whether there has been state action," those tests being whether:

1) "[T]he private entity has exercised powers that are traditionally the exclusive prerogative of the state,"

2) "[T]he private party has acted with the help of or in concert with state officials," and

3) "[T]he state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995); see also Borrell, 870 F.3d at 160 (summarizing "three broad tests generated by Supreme Court jurisprudence") (internal quotations omitted).

13

In answering the same question, the Third Circuit in <u>Benn</u> weighed several factors that run alongside the <u>Mark</u> tests to determine whether a private actor defendant acted under color of state law for purposes of a § 1983 claim, taking into account whether:

1) The challenged activity resulted from "the State's exercise of coercive power,"

2) The State "provide[d] significant encouragement, either overt or covert,"

3) The private actor "operate[d] as a willful participant in joint activity with the State or its agents,"

4) The private actor is "controlled by an agency of the State,"

5) The private actor "has been delegated a public function by the State," or

6) The private actor "is entwined with governmental policies" or "government is entwined in its management or control."

<u>Benn</u>, 371 F.3d at 171 (referring to the <u>Brentwood Academy</u> considerations as "factors") (quoting <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 296 (2001)).

Finally, in <u>Crissman</u> the Third Circuit stated that "another vantage point" which courts should use involves assessing "the close involvement of the state and interdependence of the actors in the association formed and the challenged activity" for determining "whether the conduct could be linked to [] joint beneficial activities" between private actors and the state. <u>Crissman v. Dover Downs Entertainment Inc.</u>, 289 F.3d 231, 240-41 (3d Cir. 2002). Called the "symbiotic relationship" test, this vantage holds that a "close association of mutual benefit" between private and public "dictate[s] a finding of state action." <u>Id.</u> at 240.

The parties have spent considerable focus on arguing the issue of whether the private actor defendants in this case acted under color of state law. But because the Court can dispose of the claims brought under § 1983 based on other grounds, the Court does not reach the question of

whether a private hospital and its staff acted under color of state law by reporting a post-partum

mother's drug test result to CYS, taking and maintaining protective custody of the newborn, and

then releasing the newborn following an interview and additional drug test employed by CYS on

the mother.[6]

### E. Count 1: Violations of Procedural Due Process

The Smiths allege their procedural due process rights secured by the Fourteenth

Amendment were violated by St. Luke's, Hospital Counsel, Hospital Administrators and the

Hospital Leadership Team.  The Smiths allege that these violations generally stemmed from the

actions undertaken by St. Luke's and the other individual defendants that resulted in the Smiths'

inability to take their newborn child home with them in the hours and days following its birth

and that resulted in Baby J.A.S. being restricted from access to the parents during that time.

TAC at 19-23.

To state a claim under § 1983 for violation of one's procedural due process rights, "a

plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within

the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures

available to him did not provide 'due process of law.'"  Hill v. Borough of Kutztown, 455 F.3d

225, 233-34 (3d Cir. 2006).  "The fundamental requirement of due process is the opportunity to

be heard at a meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 319,

333 (1976).  The Third Circuit has recognized that there is a "fundamental liberty interest of

natural parents in the care, custody, and management of their child."  Miller v. City of

---

[6] The Third Circuit has not ruled on this specific question, but the Second Circuit has addressed one similar.  See
Kia P. v. McIntyre, 235 F.3d 749, 756 (2d Cir. 2000).  In Kia P., the Second Circuit held that a private hospital and
doctor who assumed custody of a newborn for ten days following the mother's faulty positive drug test were state
actors because they were "part of the reporting and enforcement machinery" for the state agency "charged with
detection and prevention of child abuse and neglect."  However, the court ultimately dismissed the plaintiffs' federal
constitutional claims on other grounds.

Philadelphia, 174 F.3d 368, 373 (3d. Cir. 1999).  However, "this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children."  Croft v. Westmoreland Cty. Children and Youth Servs., 103 F.3d 1123, 1125 (3d. 1997).  "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused."  Miller, 174 F.3d at 373 (3d. Cir. 1999).  "The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations."  Croft, 103 F.3d at 1125 (3d. 1997).

"Section 1983 does not provide a cause of action for violations of state statutes."  Brown v. Grabowski, 922 F.2d 1097, 1113 (3d Cir. 1990).  Whether Defendants, as government actors affecting child protective services under the authority of state law, failed to adhere to the Pennsylvania statutes and regulations intended to guide their conduct is irrelevant to our analysis of their liability under § 1983.  Id. (state domestic violence statute was "effectively irrelevant" in court's analysis of § 1983 liability); but see Brown v. Daniels, 290 Fed.Appx. 467, 472 (3d Cir. 2008) ("'While not dispositive, the statutory scheme adopted by the Pennsylvania legislature in the familial integrity arena are highly relevant to this Court's consideration of [the procedural due process claims].'") (emphasis in original) (quoting Patterson v. Armstrong, 141 F.Supp.2d 512, 538 (W.D. Pa. 2001)).  Likewise, Defendants' arguments that their conduct was consistent with Pennsylvania law are also irrelevant under the same precedent.

"Due Process is flexible and calls for such procedural protections as the particular situation demands."  Morissey v. Brewer, 408 U.S. 471, 481 (1972).  In analyzing the question of whether Plaintiffs' liberty interest was violated without required recourse, the Court acknowledges that procedural due process rights protected under the Fourteenth Amendment generally guarantee a right to a prompt post-deprivation hearing.  Miller, 174 F.3d at 373 n.4 (3d

Cir. 1999) ("Initiating child custody proceedings by ex parte orders is generally constitutional if a prompt post-deprivation hearing is held.").

The Smiths allege that on April 9, the morning after Baby J.A.S. was born, a St. Luke's pediatrician noted in Mrs. Smith's medical history that she had tested "positive for methamphetamines." TAC at 5. Under the facts as alleged, this was a clear mistake on behalf of the doctor, since the test administered to Mrs. Smith at the time could not differentiate between amphetamine and methamphetamine in rendering a result. It wasn't until the night of April 9 that the Smiths allege they were informed that the hospital believed Mrs. Smith had tested positive "for methamphetamine" and because of this result a report was made to CYS. TAC at 7. The hospital then allegedly locked down the NICU and security guards escorted the Smiths out of the building; only Mrs. Smith would be allowed back in to visit Baby J.A.S. over the next two days, and then only with round the clock supervision. TAC at 8-9. On the morning of April 12, a CYS caseworker visited Mrs. Smith in the NICU and interviewed her. TAC at 13. At some point on April 12, Baby J.A.S. was allowed to leave the NICU and go home with Mrs. Smith. Id.

"At some point, a delay in the [post-deprivation] hearing would become a constitutional violation." Cleveland Bd. of Educ. V. Loudermill, 470 U.S. 532, 547 (1985). Loudermill asks courts to assess whether a post-deprivation hearing was "unreasonably prolonged." Id. The Third Circuit has not provided a precedential bright-line rule for the facts in this case. Cf. Dennis v. Dejong, 557 Fed.Appx. 112, 117 (3d Cir. 2014) ("[T]he County's failure to provide the parents with a pre-deprivation hearing did not amount to a violation of procedural due process because a post-deprivation hearing was held within 72 hours."); Patterson v. Armstrong Cty. Children and Youth Servs., 141 F.Supp.2d 512, 539 (W.D. Pa. 2001) (holding that the Fourteenth Amendment requires the state "initiate and provide a judicial hearing, with notice and

meaningful opportunity to be heard, within 72 hours of taking a child suspected of being abused into protective custody").  "In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 242 (1988); see also Hill v. City of Scranton, 411 F.3d 118, 134 (3d Cir. 2005) ("[The delay must be 'unjustified.'  We have held that the 'mere allegation of a . . . delay without supplementary allegations concerning the cause of the delay does not state a constitutional claim.'") (quoting Ritter v. Cohen, 797 F.2d 119, 124 (3d Cir. 1986)).

The harm allegedly suffered by Plaintiffs from the delay was somewhat significant.  It is alleged that Mr. Smith was unable to bond with his newborn for 2-3 days.  Mrs. Smith was only able to visit Baby J.A.S. under the supervision of hospital security.  The separation of the parents at this time from each other, their other children and their home as alleged is much more than an inconvenience, but was not long enough to so forcefully trip the due process switch.

As for the justification for the delay, it is alleged that the St. Luke's and its staff did not take steps to afford the Smiths an opportunity to be heard, whether or not it was within their authority to release custody of the newborn at that point.  Still, the Smiths allege (and Defendants argue in their Motion) that the hospital and doctors were actually concerned about the health of Baby J.A.S.  TAC at 12.  While this may afford an excuse as to why Baby J.A.S. could not be immediately released, it does not resolve the potential lack of a prompt hearing.  Furthermore, the likelihood that the interim decision to take custody of the newborn was mistaken was significant given Mrs. Smith's prescription for Vyvanse, a drug which Plaintiffs allege can result

in a positive result for a urine test that tests for amphetamines undifferentiated from methamphetamines.  See Croft,103 F.3d at 1126 (3d Cir. 1997) ("[A] state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.").

Weighing slightly in favor of Defendants is the not-insignificant burden that requiring a nearly immediate post-deprivation hearing under these alleged facts would likely incur.  See Solomon v. Philadelphia Housing Auth., 143 Fed.Appx. 447, 454-55 (3d Cir. 2005) (taking into account the "administrative burden" of making delays "intolerable") (citing Loudermill, 470 U.S. at 544).

Balancing these factors, the Court finds that the Smiths have not adequately pleaded facts establishing that they were denied for too long a post-deprivation hearing reviewing the hospital's decision to take custody of their newborn based on the results of the drug test.

The Smiths also claim that Defendants should have had to provide, under the Fourteenth Amendment, notice and a court order within 24 hours in order to retain custody of Baby J.A.S. over the entire period.  The Court does not agree.  While the 24-hour rule is the mark under Pennsylvania law, federal law has not required such a bright line rule.  The government interest in protecting children from suspected abuse outweighs the need to impose a federal constitutional requirement of a court order.

Therefore, Count 1 will be dismissed with prejudice.

### F.  Count 2:  Violations of Substantive Due Process

Mrs. Smith alleges that her substantive due process rights under the Fourteenth Amendment were violated, this time by St. Luke's, Hospital Counsel, Hospital Administrators,

the Hospital Leadership Team and Hospital Security Guards.  Mrs. Smith alleges specifically

that her privacy interest was violated by the round the clock supervision employed by the

hospital during her visits to the NICU to breastfeed and care for Baby J.A.S.  TAC at 26-28.

In order to state a claim under § 1983 for violations of substantive due process, a plaintiff

"must establish that the particular interest at issue is protected by the substantive due process

clause, and that the government's deprivation of that protected interest shocks the conscience."

Kane v. Barger, 902 F.3d 185, 192 (3d Cir. 2018) (internal quotations omitted).  "The exact

degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the

circumstances of a particular case.'"  Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) (quoting

Lewis, 523 U.S. at 375).

It is recognized that "[i]ndividuals have a constitutional liberty interest in bodily integrity

that is protected by the Due Process Clause."  Phillips v. Cty. Of Allegheny, 515 F.3d 224, 235

(3d Cir. 2008) (citing Ingraham v. Wright, 430 U.S. 651, 672-74 (1977)); accord Reedy v.

Evanson, 615 F.3d 197, 230 (3d Cir. 2010) ("There is little that is more personal than an

individual's bodily integrity.").  However, the Court will not rule on whether the alleged round-

the-clock supervision employed by the hospital, which necessarily included viewing Mrs. Smith

while she was breastfeeding Baby J.A.S., implicates Mrs. Smith's constitutionally protected

interest in her bodily integrity.  There is no need, because even if Mrs. Smith's right to bodily

integrity was implicated, the allegedly infringing conduct does not rise to a level that shocks the

conscience.  Balanced with the need to maintain a custodial relationship with the child, the

actions taken by Defendants in this respect were reasonable and not intrusive enough to infringe

on any rights to bodily integrity.  Particularly, the Smiths allege that the security guards were not

in the same room as Mrs. Smith while she would breastfeed Baby J.A.S., but that they were

outside of Baby J.A.S.'s NICU "pod" and able see in through the doorway, the glass walls, and hear from outside the room.  TAC at 9-10.  The Smiths do not plead that the guards or hospital staff committed egregiously intrusive acts, or that anyone watched her for extended periods as she would breastfeed Baby J.A.S.  See Kane, 902 F.3d at 194 (reasoning that because defendant police officer "acted for his own gratification, rather than investigative ends" in photographing plaintiff sexual assault victim's intimate areas, the officer behavior was conscience-shocking).  In all, it seems that the guards and staff could have afforded Mrs. Smith some more privacy for the torrid situation she was in.  However, the Court does not find that these allegations, measured against the interest of the state, were intrusive enough to 'shock the conscience,' assuming arguendo that a substantive due process right was even implicated.

Therefore, the Court will dismiss Count 2 with prejudice.

### G.  Count 3: Violations of Equal Protection

Mrs. Smith also alleges that her equal protection rights under the Fourteenth Amendment were violated by those same Defendants from the substantive due process violation: St. Luke's, Hospital Counsel, Hospital Administrators, the Hospital Leadership Team and Hospital Security Guards.  Specifically, Mrs. Smith alleges that her equal protection rights protected under the Constitution were violated because the hospital employed only male security guards to supervise her during her visits to Baby J.A.S. in the NICU.  TAC at 32.  Mrs. Smith argues that because the guards provided by Defendants for her supervision were not female, she was subject to humiliation when the guards "physically invaded the private sanctum of a breastfeeding mother with random insertions for voyeuristic observations."  Id.

Under the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Clause

provides that "all persons similarly situated should be treated alike."  <u>Harrington v. UPMC</u>, No. 20-0497, 2022 WL 1606422, at *15 (W.D. Pa. May 20, 2022) (citing <u>Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.</u>, 422 F.3d 141, 151 (3d Cir. 2005)).

As part of stating a valid equal protection claim, a plaintiff "must demonstrate that they received different treatment from that received by other individuals similarly situated."  <u>Blunt v. Lower Merion Sch. Dist.</u>, 767 F.3d 247, 273 (3d Cir. 2014) (internal quotations omitted).  Here, Mrs. Smith's claim may be dismissed because she does not state sufficient facts (if any) that anyone similarly situated to her received different treatment by Defendants.  Ensuring that female security guards be employed to supervise breastfeeding mothers is simply not a matter of equal protection.

Therefore, the Court will dismiss Count 3 with prejudice.

### H.  <u>Count 4: Violations of Americans with Disabilities Act</u>

Mrs. Smith also alleges that St. Luke's is liable for violations of her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*, which forbids some public businesses from being discriminatory in the way they treat any of their customers based on a customer's medical disability.  Mrs. Smith alleges that St. Luke's violated the ADA by denying her, a person diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), "equal enjoyment of access to her new born baby as wells as goods, services, facilities, privileges, advantages, and accommodations."  Mrs. Smith points particularly to the faulty drug test, stating that St. Luke's alleged failure to "differentiate" between illegal methamphetamine and the legal ADHD medicines to which she is prescribed constitutes discrimination based on her ADHD diagnosis.

Under 42 U.S.C. § 12182(a), "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who leases (or leases to), or operates a place of public accommodation."  Defendants do not challenge whether St. Luke's is a place of public accommodation, nor do they challenge whether unfettered access to one's newborn child and access to postnatal services and facilities at St. Luke's constitute the sorts of protected privileges under the statute.  Defendants also do not challenge whether Mrs. Smith's ADHD diagnosis qualifies as a disability under the statute.  Defendants argue solely as to liability that the drug test should not make them liable under the ADA, and also that Plaintiffs' claim is deficient because it only alleges past discrimination and because money damages cannot be awarded for an ADA claim against a public accommodation.  Because Mrs. Smith lacks standing to bring her ADA claim, the Court will dismiss the claim with prejudice.

Defendants are correct that monetary damages are not allowed for ADA claims alleging discrimination in public accommodations, as stated by the clear language in the statute.  See 42 U.S.C. 12188(a)(1) ("The remedies and procedures set forth in section 2000a-3(a) ["Civil Actions for Injunctive Relief"] of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter.").  Because Plaintiffs demand only monetary relief for their ADA claim (compensatory and punitive damages) and not the appropriate injunctive relief, the claim is improper.  See TAC at 38.

Plaintiffs recognize this defect in their Response and argue that their ADA claim should not be dismissed on a "mere technicality."  Resp. Br. (ECF 55-1) at 11.  Rather, Plaintiffs ask

that the Court grant Plaintiffs leave to amend.  Plaintiffs point out that they had already asked for injunctive relief for their ADA claim in their original complaint.

Normally, the Court would elect to dismiss such an improper claim without prejudice to allow for the plaintiff to plead a proper ADA claim.  But no such claim exists for Mrs. Smith under the facts as alleged.  This is because Defendants are also correct that Mrs. Smith's ADA claim is backward-looking only, which vitiates Mrs. Smith's standing to bring such a claim. ADA claims for injunctive relief are valid only if they "demonstrate a 'real and immediate threat' of injury."  Access 4 All, Inc. v. Absecon Hospitality Corp., No. 04-6060, 2006 WL 3109966, at *5 (D.N.J. Oct. 30, 2006) (quoting City of L.A. v. Lyons, 461 U.S. 95, 103-04 (1983)).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).  Mrs. Smith only alleged injuries resulting from the inability to be with Baby J.A.S. and her lack of access to postnatal amenities available at St. Luke's; these injuries, while apparent in the hours and days following Baby J.A.S.'s birth, are no longer apparent and do not qualify as injuries-in-fact required for standing to bring an ADA claim for injunctive relief.  Furthermore, Plaintiffs have not pleaded any facts suggesting a continued patronage of St. Luke's in the future that may suggest the potential for future injury. See Harty v. Burlington Coat Factory of Pennsylvania, L.L.C., No.11-1923, 2011 WL 2415169, at *4 (E.D. Pa. June 16, 2011) (considering the likelihood of the plaintiff returning to the place of the alleged ADA violation to determine injury-in-fact).

Because Mrs. Smith's ADA claims are improper and because Mrs. Smith does not have standing to bring her ADA claim, Count 4 will be dismissed with prejudice.

## I.  <u>Counts 5 & 6: Intentional Infliction of Emotional Distress</u>

Plaintiffs allege two separate counts of IIED.  In Count 5, Mr. and Mrs. Smith allege a claim of IIED against St. Luke's, Hospital Counsel, Hospital Administrators and the Hospital Leadership Team for denying the Smiths "the custody, care, and control" of Baby J.A.S., for failing to adequately investigate the reasons underpinning this denial, and for "falsifying medical information to state authorities" by relaying Mrs. Smith's drug test result.  See TAC at 40.  The Smiths allege that having been subjected to this treatment was no minor inconvenience and that the two parents have sustained continuing physical injuries as a result of the mental toll from the three-day ordeal, including panic attacks, stomach problems, back spasms, nightmares, anxiety, depression and intense headaches.  See TAC at 41.

In Count 6, just Mrs. Smith alleges a separate IIED claim against St. Luke's, the Security Guards, Hospital Counsel, Hospital Administrators and the Hospital Leadership Team for its treatment of Mrs. Smith in the NICU, mainly the 24/7 surveillance of Mrs. Smith which Plaintiffs allege caused Mrs. Smith "to feel grief, fear anxiety, stress, chagrin, disappointment, worry, shame, humiliation, and embarrassment."  See TAC at 45.  Mrs. Smith alleges that she suffers from the same continuing physical injuries specified in Count 5.

The Court does not reach the merits of the Smiths' state law claims asserted against Defendants because the Court, in its discretion provided under 28 U.S.C. § 1367, declines to exercise pendent jurisdiction over these claims.  See Carnegie Mellon Univ. v. Cohil, 484 U.S. 343, 350 (1988) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.").

V.    **CONCLUSION**

For the reasoning set forth above, the Court will:

- Grant Defendants' Motion with prejudice as to all federal claims asserted by Plaintiffs Grace Smith and Michael Smith.

- Decline pendent jurisdiction as to the Smiths' state law claims.

- Refrain from considering all claims asserted by Baby J.A.S. until the parents elect how they would like to proceed pursuant to the accompanying Order.

- Order the Smiths to either 1) retain a lawyer to represent Baby J.A.S. in this litigation (and themselves, if they like), or 2) petition the appropriate state court to appoint a guardian for Baby J.A.S. for the limited purpose of representing the interests of Baby J.A.S. related to this litigation.

The Court will give the Smiths thirty (30) days to decide how to proceed.

An accompanying order follows.